## John M. Redus et al *v*. Richard M. Hayden et al.

1. TENANT BY THE CURTESY.—This tenure exists when a man marries a woman seised of an estate of inheritance in fee simple or fee tail, and has by her issue born alive, capable of inheriting her estate. 2 Bl. Comm., pp. 99, 100. The seisin must be during the coverture, and, at common law, in fact, or the husband cannot be tenant by the curtesy. The necessity of entry originated in the rule—invariable at common law—that an entry must be made in order to vest a freehold ; and, perhaps, for the further reason that it was incumbent upon the husband to preserve, unembarrassed, the descent to the issue of the marriage.

2. SAME IN THIS STATE.—Livery in seisin, with its attendant ceremonies, being here unknown, and the *pedis possessio* unnecessary to vest a freehold, the estate by curtesy attaches whenever there is a seisin of the wife during the coverture, with actual possession of the husband and wife, or the right to immediate entry by their voluntary act, unobstructed by an adverse occupant.

3. SAME—ILLUSTRATION AT THE BAR.—R., at his death, in 1844, devised lands to his widow for life, with remainder to his daughter D., who subsequently married, had issue, and died in 1856, and the widow of the devisor died in 1859. *Held:* That D.'s husband could have no estate by the curtesy in the premises, because there was no entry or right of entry, during the coverture. *Semble:* That it would have been otherwise had D. survived the tenant for life.

4. CHANCERY SALES.—The English practice of conducting sales by a permanent master of the chancery court, and keeping such sales under the continual direction and control of the chancellor, of re-opening the biddings upon advances of the property in price, and thus making the court the vendor, does not prevail in all its extent in this country. With us such sales are more like sheriff's sales under execution ; the most important difference being that the commissioner making such sales here must report his proceedings for the action of the court.

5. SAME—CONFIRMATION.—Confirmation by the court in this state is not indispensible to complete the sale. The court has a sound and well-defined legal discretion to set aside sales before confirmation, for good cause. (Mitchell v. Harris, *supra*, 314.) But the title in either real or personal estate may be effectually vested in the purchaser at such sales by confirmation *in pais*, arising from the acts of the parties in interest.

6. CASE IN JUDGMENT.—Where there has been a substantial execution of the decree, by an open and fair sale, a deed and possession given, and the purchaser, continuing

in possession, has enjoyed the profits and products for several years; such acts are held to be a confirmation *in pais*, so far as the parties in interest are concerned; and the mere fact that the price was inadequate, on the one hand, or excessive, on the other, will not entitle either party to set aside the sale.

7. SUBSTITUTING ANOTHER IN LIEU OF THE PURCHASER—ESTOPPEL.—Where, at a chancery sale, a slave was knocked off to one C., but A., who was not present at the sale, afterward took the slave and executed his own bond with security for the purchase money, in which it is recited that A. was the purchaser. *Held:* That A., when called on for payment, is estopped by principles of good faith, from denying that he was the purchaser.

Appeal from the chancery court of Marshall county. VANCE, J.

The appellants in error assign the following errors:

1st. The court erred in not affirming the sale made to Wm. Hull, of the lands of which the said Hull became the purchaser, and for the purchase money of which he gave his bond with A. M. Clayton, his surety, and in canceling said bond.

2d. The court erred in not confirming the sale of the slave named Joe Wade, to F. C. Ayres, and for the purchase money, of whom Hugh Davis united as surety in the bond of said Ayres, and in canceling said bond.

3d. The court erred in not confirming the sale of the land and slaves in the said cause mentioned, and in not giving decrees for the purchase money thereof, against the purchasers severally, and their sureties, and ordering executions on said decrees.

*J. W. C. Watson*, for appellants.

It is submitted that the said Joseph Ayres had no interest in the property, and was not a necessary party. When he intermarried with the said Delia F., her mother was in possession of all the property, as tenant for life under the will of her father, who died in 1844. By his will he gave to his surviving wife a life estate in all the property. She took possession of and held it as tenant for life until her death in 1859. When Delia was married in 1850, this life estate existed, and so continued until after her death. During her entire coverture her interest was a remainder or reversion expectant upon an estate of freehold. She, therefore, never had seisin. Without such seisin during coverture her hus-

band could not be tenant by courtesy. It is admitted that actual seisin in law, during coverture, which always carries with it the right of entry, is enough, but Delia had no right of entry during her coverture. Tyler on Infancy and Coverture, p. 399, sec. 266; 1 Washburn Real Property, pp. 135, 136, 137, 138, secs. 32, 33 and 34, side paging; Day v. Cochran, 24 Miss., 261–274, 275, 276, 277; Malone v. McLaurin, 40 Miss., 165. Joseph Ayres had no interest in the slaves in which his wife, who left a child surviving at the time of her death, had an interest by way of reversion or remainder. See married woman's law of 1845.

The defendants have considered the case as a bill for specific performance. Conceding the analogy, complainants are entitled to a decree. At the time of the purchase, defendants were placed in possession of the property, and were the vendees of the land in the undisturbed enjoyment thereof. No one of the defendants alleges that injury has resulted to him from the delay that has occurred in the confirmation of the sale; and were they now asking the confirmation of the sale, on what possible grounds could complainants have resisted their motion? Chief Justice Marshall states the equitable principle in these words: "The court could allow one party to hold himself prepared to avail himself of all favorable contingencies without being affected by those which were unfavorable." Brashier v. Gratz, 6 Wheaton, 628–539. See also, Ahl v. Johnson, 20 How., 511. That possession, taken and held by the defendants, of the property purchased, is an important element in all cases brought for specific performance, by the vendor; See 7 How., S. C. Rep., 159; 2 Black, 500–508. A vendee in possession cannot place his vendor in default so as to be entitled to a rescission of the contract, without an offer on his part to perform. Jones v. Loggins, 37 Miss., 546; Walton v. Wilson, 30 Miss., 576. We submit further, that as to the vendees of the slaves, the case of Josselyn v. Caughlin & Brown, 27 Miss., 852, and 30 Miss., 505, is conclusive against them. See also, 41 Miss., 370–382. This was the case of

the sale of a negro under a void order of the probate court. The defense relied on by the purchaser was that he had acquired no title, and that the slave had died before suit was commenced for the purchase money. The pleas were held bad. 30 Miss., 503; Ware v. Houghton, 41 Miss., 870–882.

The powers and duties of courts of chancery in Mississippi, in the matter of sales, are not, in all respects, similar to those of the English courts of chancery. In England the sale is always for cash, and the duty of the master seems to be merely to make the contract. " He reports his proceedings to the court, who thereupon require of the parties to execute the proper deeds—the master being a kind of agent to bring about by means of the court a conveyance by deed from the vendor to the purchaser." 2 Washburn on Real Property, 562, 2d ed.; Sugden on Vend., 37. The English practice is concisely stated by Mr. Justice Yates in the case of Morrell v. Lawrence et al., 12 Johns. R., 528. And it is submitted that the statute of this state, Rev. Code, p. 549, art. 59, and the decisions of our courts are in conformity, not with the English, but with the New York practice. So, likewise, is the practice in the state of Tennessee. See, also, Polk v. Sledge. [Reported in Memphis Appeal.] 5 Caldwell Tenn. R., 384; 4 Caldwell Tenn. R., 633–641; Conges et al. v. Johnson et al., 4 S. & M., 210; Henderson v. Herrod et al., 23 Miss., 434–453; 1 S. & M. Chan. R., 345; Sugden on Vend., 63–74, 1st Am. ed., bottom of page; 2 Dan. Ch. Pr., 1282, 1283; Jackson v. Edwards, 7 Paige, 386; ib., 411, 412; Sugden on Vend., 49, 50, bottom paging, 1st Am. ed.; 2 Daniel's Ch. Pr., 1272. In Learned v. Matthews, 40 Miss., 228, these authorities are recognized. Referring to Sugden, the court say: " He shows, also, that under the English practice it is the duty of the purchaser to procure the master's report, and to obtain the confirmation of it at his own expense; though in case of his failure, the vendor may do it." See Josselyn v. Caughlin, 27 Miss., 852; 30 Miss., 502; 2 Daniel's Ch. Pr., 1283. See United States v. Tengers, 5 Peters, 115–129; Beall v. Downman et al., 1 McCall,

249; Johnson v. Merryweather, 3 McCall, 523, 524. The sales having been *bona fide* made, and such under the circum: stances as the court should confirm, and the bonds given by the purchasers voluntary and obligatory, the powers of the. court are adequate to the enforcement of the payment of the purchase money. A purchaser under a decree submits himself to the jurisdiction of the court in that suit as to all matters connected with such sale; and this is also true of the sureties of the purchaser. Regina v. Rea, 2 Paige, 389; 2 Daniel's Ch. Pr., 1279, 1280; 15 Grattan R., 288; 2 Swan., 340. Or, at least, the sales being confirmed, suits can be maintained on the bond as common law obligations.

The testimony offered by the defendant, Hugh Davis, to prove that his principal, Ayres, was not a purchaser at the commissioner's sale, is irrelevant and incompetent. The parties to the bond are estopped from denying the facts recited in it. By giving the bond, Ayres acquired possession of the slave he purchased, and it was the name of the defendant, Davis, that made the bond acceptable. That the principle of estoppel applies here, see Cox et al. v. Thomas, 9 Grattan, 313; Cecil v. Early, 10 Grattan, 198–680; 2 Daniel's Ch. Pr., 480; 2 Daniel's Ch. Pr., 1282, 1283, 1284, note 5.

The defendant in error, Hull, and his surety, Clayton, insist that the sale of the land, should not now be enforced, because of the great delay, and the great depreciation in the value of the land. To this, we reply first, the purchaser is no less responsible for this delay than the commissioner appointed to make the sale. It is the right and the duty of the purchaser, to call for the report of the sale and the action of the court upon it. See the authorities hereinbefore cited. This principle is recognized in Henderson v. Herrod et al., 23 Miss., 434 and 454. The language of the court is, " each party has the right to move for, or resist a confirmation." 2d. The authorities holding that the confirmation is necessary to the vesting of the title in the purchaser, have no application to the case at bar. The purchaser was placed in the possession of the property, and had it in actual cultivation,

when the decree below was rendered. Had the property advanced in value, performance as against the vendors could certainly have been specifically enforced. See S. & M. 493; 23 Miss., 434 and 450. The purchaser does not allege that he has ever offered to perform the contract on his part. The vendor is never in default until the vendee has offered compliance on his part. That the vendee must put the vendor in default, before he in any way disaffirms the contract, is the well settled law of this state. In addition to the cases heretofore cited, see Johnson v. Beard, 7 S. & M., 214; Sandifer v. Davis, 13 S. & M., 40.

As to the purchase of the slave Joe, by F. G. Ayres, see the authorities already cited; Josselyn v. Caughlin et al., 3 Miss., 502; Bohannan v. Madison, 31 Miss., 348; Ware et al., v. Houghton, 41 Miss., 381, 382, and 384; 34 Miss., 304. If the sale was void, under the circumstances, Ayres should have instantly returned the property to the commissioner. 31 Miss., 348. As to the alleged unsoundness of the slave, see 41 Miss., 382. It is alleged, however, that the sale was made by Cocke, individually, to Ayres. Ayres agrees to be substituted in the place of Cocke, who it is alleged, had purchased the slave at his own sale. This is shown by the fact that he, Ayres, gave his bond for the purchase money, reciting that he had purchased the slave at the commissioner's sale. By the recital in this bond, the obligors are not estopped. 9 Grattan, 320, and 321, and the authorities there cited.

The purchaser at a sale under a decree of a court of chancery, and his surety must submit themselves to the jurisdiction of the court, as to all matters connected with the case. See the references to 2d Daniel Chan. Prac., and to 2 Swann's Tenn. Rep., already cited. See also, Clarkson v. Reid et al., 15 Grattan's R., 29 and 92, and the cases there cited.

*A. M. Clayton*, for appellees.

The defendants both answer and demur to the bill, and this brings up the main question, shall the report be confirmed? Confirmation is resisted by the defendants. 1st. Upon the ground of the great lapse of time, and the total change of

circumstances and condition of the parties, of the country, and of the property itself. 2d. Because the title tendered is not above exception. 3d. Because the proper parties were not made to the original bill.

The court below refused to confirm, and dismissed the bill, and the case comes here, by writ of error to this court.

It is submitted that this decree is right and ought not to be reversed. The lapse of time is a sufficient reason to prevent confirmation. Confirmation of a report of sale by the commissioner is a necessity. This very bill is filed to obtain confirmation upon the sole ground that the sale and the bond given under it do not avail the parties without a confirmation. But besides this inevitable concession of the bill, our high court has, on many occasions, declared its indispensable necessity. Learned v. Matthews, 40 Miss., 229, lays down the rule distinctly, " that the purchaser is not considered as entitled to the benefit of his purchase until confirmation." In the case *ex parte* Buck, ib., 242, they do say, " the acts of ministerial officers, required to be reported to the court, are only binding when they become the acts of the court, and they only become so by its ratification. They cite and approve Learned v. Matthews quoted above. This rule is very strongly stated in the English books as equally applicable to vendors as to purchasers seeking to enforce the sale. See 2 Daniel Chy. Prac., 1,454–61; Sugden on Ven., 37; 2 Robinson's Prac., old ed., 387; Heywood v. Covington's heirs, 4 Leigh. In one case, it is very concisely said, "A contract of sale between the court as a vendor, through the agency of a trustee, and the purchaser, is never regarded as consummated until it has received the sanction and confirmation of the court." Wagner v. Cohen, 6 Gill.; 2 Hilliard on Vendors, 117. The true theory of sales of this character is, that the court is itself the vendor, and the commissioner or master the mere agent for executing its will. 40 Miss., 228. The court only can give the purchaser permission to take possession of the land. 2 Daniel Prac., 1457; Sugden on Ven., 38. See, also, Learned v. Matthews, 40 Miss., 225, 227.

In *ex parte* Buck, 40 Miss., 252, before cited, the court, in substance, says: " By requiring a report to be made to the court, it is intended that the court should determine whether it is in all respects proper and should be ratified." This is the rule held in regard to the sales of real estates of decedents. Sugden, on page 45 of his work, says: " The authority which the court has over these contracts, enables it, in a proper case, to relieve the purchaser as well as the suitor, and where the contract is inequitable, the purchaser, on submitting to forfeit his deposit, will be discharged from his purchase." Our law does not require any deposit; so the principle is in force without any forfeiture. The rule in regard to specific performance is, that the relief must be sought in a short time, without any unreasonable delay, before there is any material change of circumstances, or any great depreciation in the value of the land, and the complainant must be without fault himself. Liddell v. Sims, 9 S. & M., 609; Johnson v. Jones, 13 ib., 583; see, also, Jones et ux. v. Smith, 33 Miss., 215; Pratt v. Carroll, 8 Cro., 471; 1 Hilliard on Vendors, 436; also Bank of Alexandria v. Lyman, 1 Peters S. C. R., 371. The discretion of the court must be exercised in accordance with principle, not arbitrarily or capriciously. Woolam v. Hearn, 2 Leading Cases in Equity, 698 and notes; 2 Story Eq., 57; Smith v. Christmas' heirs, 7 Yerger, 581.

After the report of the sale the purchaser may except to it and ask for its confirmation or rejection. Before the report, he cannot. By the statute, Rev. Code, 549, the bonds for the purchase money are to be filed in the clerk's office, and may be paid there at maturity. If this is not done, the purchaser is deprived of important rights. He could not pay the money into court because the bonds were not there; he could not pay to the commissioner, for until confirmation, he was not authorized to receive it. The purchaser is thus tied up; he can pay no one, and if this course is sanctioned, he is held bound, after a lapse of now nine years, precisely as if there had been no delay. If this is onerous as to the principal, it is much more so as to the surety. The sale is not valid

as yet; this whole proceeding is based upon that concession; it is not valid until confirmation, but if confirmed, it becomes valid by relation from its date. This doctrine of relation rests upon the rule that it shall not affect the rights of third persons. See Brown v. Clarke, 4 How. S. C. Rep., 4. The surety is but a third person; he is not bound now; he is, and was from the commencement, only to become bound by the confirmation of the report. If you bind him now by your confirmation, after the time which was in the contemplation of all the parties, when the sale was made, you do most materially affect his rights by relation.

I pass now to the inquiry, whether the title tendered is a good one and such as the court ought to compel the purchaser to take when he objects to doing so; and under this head, the court will consider the delay in connection with the actual condition of the title. In Jackson v. Edwards, 7 Paige Chy. Rep., 412, where the delay was less than two years, the court says, " the purchaser ought not to be required to take even a good title after such a delay, when he could not have the substantial benefit of his purchase." That principle is decisive of this case. The rule of *caveat emptor* does not apply to sales made by a commissioner or master in chancery. 2 Hilliard on Vendors, 216. Sugden says, " If the parties differ as to the validity of the title to the estate, the master must make his report upon the title, to what exceptions may be taken." Sug. Ven. 39, 1 Am. ed. The objection to the title in this case is, that there is an outstanding right of curtesy in a part of the land, in Joseph Ayres. He married Delia F. Redus, one of the heirs; had a child by her, still living, and his wife died after the death of her father. The said Joseph is still living, and was not made a party either to the present or the original suit. If he ever had title, therefore, he still has it, as it is not pretended that he has parted with it. Has he title? The bill states that Thos F. Redus, the ancestor, died in 1844, and by his will devised this land to his wife during her natural life or widowhood; that she accepted the provision, and is now dead. The bill

also sets out the heirs of said Thomas Redus, to whom the land descended. Did Delia F. Ayres have the seisin in the land, which in law, is necessary to entitle her husband to curtesy? We maintained that she had.

It will be noticed that the widow of T. Redus, the testator, never had dower in the land, but accepted the devise in lieu of dower. The rule at common law in regard to dower is, that the right is consummate on the death of the husband, but the widow is not seised; the heir is, and she consequently claims through his seisin. But by the assignment of dower the seisin of the heir is defeated *ab initio*, and the dowress' interest is a continuation of her husband's seisin. Tyler on Infancy and Coverture, 615–634. But Mrs. Redus took by devise, and the seisen of the heirs, cast upon them by descent, continued without interruption during the whole life of his widow. She took a devise in lieu of dower, and that constituted a charge or an encumbrance upon the lands, but did not deprive the heirs of their seisin. The devise, at most, amounted to an encumbrance on the land.

The bill itself sets out the children and grand-children of Thomas Redus, not of the widow; and they claim through him, not through her. Now the rule is, that the heirs must claim as heirs of the party last seised, 4 Kent 29, and this is a tacit admission that she was not seised. To this point likewise goes the rule, that a covenant against encumbrances is broken by the establishment of dower, but a covenant of seisin is not. Rawle on Covenants for Title, 51. The devisee is, technically, a purchaser, and the descent is cast upon the heir, not upon the purchaser. 2 Blackstone, 194–5.

The case of Malone v. McLaurin et al., 40 Miss., 162, is not at all at variance with the doctrine here advanced. The rule on the subject of curtesy, as stated by Chancellor Kent, was adopted by our high court. 40 Miss., 163. But in this state, the descent of lands, where there is no actual adverse possession, is a seisin sufficient to give the right of curtesy. Robb v. Griffin, 26 Miss., 582. In our case the heirs of Redus had title by descent cast upon them, where there was no

adverse possession, and the widow claimed by devise, and was thus a purchaser. The seisin in fee remained and continued with them, and the devise for life did not divest it. There is abundant authority in our own court to prove that such seisin was sufficient to vest Joseph Ayres with the rights of a tenant by the curtesy. Day v. Cochrane, 24 Miss., 277, and Robb v. Griffin, 26 Miss., 282, cited above. These two cases preclude all doubt upon that point. This last case where such broad language is used, is a clear authority in favor of the right of Ayres to the curtesy, and consequently against the confirmation of the sale.

Where there is a devise of a life estate, and the fee simple is not disposed of by the will, but descends to the heirs, then the seisin is cast upon the wife who is one of the heirs at once. There is seen the concurrence of the four elements, which make up the right of curtesy marriage, birth of issue, seisin and death of wife. If these views do not fully establish the right of Ayres to curtesy, I think no one, upon a view of the whole case, can fail to come to the conclusion that as much of doubt rests upon the title that a purchaser ought not to be compelled to take it. Ayres was not a party, and is therefore not precluded from setting up his right in future. A court of equity will not compel a man to pay his money for a doubtful title. See Edwards v. Jackson, 7 Paige, above cited; Watts v. Waddle, 6 Peters, 389; Spring v. Sanford, 7 Paige, 556.

Reliance is had on the other side upon the fact that a deed was executed by the commissioner to the purchaser, and placed upon the record of the probate court in Marshall county, on the 30th January, 1861. This deed was executed without authority or direction of the court. The decree directed him to make report of his proceedings to the next term of the court, but did not direct him to execute a deed. The deed without confirmation by the court is a nullity. 2 Hilliard on Vendors, 217; 2 Daniels' Ch. Pr., 148.

It is again insisted by the complainants that the parties have themselves, by their own acts, confirmed the sale of the

land, and that consequently, confirmation by the court is unnecessary. To this there are several conclusive replies. A number of the parties are infants; and no act *in pais*, either of their own or of others, can bind them, or amount to confirmation on their part. Next, neither the bill nor the notice makes any such case. No acts are set out, which are alleged to amount to confirmation. On the contrary, the prayer is for confirmation by the court, and in the last stage of the proceedings, the complainants retained their right to insist upon confirmation. If already confirmed, it is a vain thing to ask of the court to re-confirm it. The defendants also insist that the acts relied on as confirmation of the sale are not sufficient to have that effect. Those acts are set out in the evidence of Hull.

Confirmation, like every other matter of contract, must be mutual, in order to be binding. The infant parties could not confirm, or give a binding assent to confirmation, by matter *in pais.* No acquiescence has been shown on the part of the defendants, which can affect their rights. On the part of Clayton, the surety, it is insisted that it would be highly inequitable to enforce the contract against him. Sugden, p. 87, says, " that the purchaser cannot be compelled to complete his purchase, until confirmation." Our high court sanctions and adopts the English practice; and in the cases already cited, says, " there is no sale until confirmation."

In Anthony v. Leftwich, 3 Randolph, 248, the court would not enforce a contract after the lapse of six years, against the daughter of the vendor, for whom he had made no other provision in his will, than a devise of the land sold to the complainant; and similar ground was taken in Cullen v. Ferguson, 5 Casey, 247.

*Harris & Withers,* on same side.

The "Tenancy by the curtesy of England " exists here as part of the common law.

In the present case the question relates to the fact of seisin of the wife during coverture. The testator had devised the land to the wife for life, but did not by his will make any
VOL. I—40

disposition of the fee, which of course descended to his heirs, of which the wife of Ayres was one. This devise, if not by the express language of the will, was, by the operation of the statute, made a devise in lieu of dower. Art. 168, Code, 468. It could not take effect without an election to accept it, indicated by a positive renunciation of the dower, or by the failure to renounce for the space of six months. Art. 169, Code, 468. Her election is a purchase of the land devised, the dower being the consideration, and she is regarded as a purchaser for value, on her electing the devise. Rev. Code, 469, art. 170; 2 Scribner on Dower, 496.

The question arises, where and in whom is the estate and seisin during this six months, and prior to renunciation? The right of dower or the estate of the doweress, is to initiate practically, until it is assigned by the heir or allotted by the probate court. The widow has no separate seisin before assignment takes place, and in the mean while the heir is seised of the freehold in common with the widow; 4 Kent, 73 (marg. p. 72), and should the widow die before assignment, beyond all doubt, the seisin of the heir, not being defeated by the assignment, would support the tenancy by the curtesy. It is the assignment alone which defeats the seisin cast upon the heir, and renders it void *ab initio*, and this peculiar effect: The relation back of the seisin of the freehold to the death of the husband, so as to avoid and defeat a rightful seisin which the law casts on the heir, belongs to the assignment of dower only. A devise at common law did not carry seisin to the devisee. In this country, the courts have held that a devise of vacant, wild lands, gave seisin to the devisee; but beyond this the authorities do not go. 1 Washburn on Real Property, 160, § 29. It is conceded that these devises are viewed as chattel interests. Washburn Real Prop., 162 §§ 35, 36.

The devise to a widow in lieu of dower differs from an absolute devise without conditions. It is but an offer to purchase her dower, and must be accepted before it can be said to vest in her. It does not take effect simply by the death

of the husband, but only on a future event, election and renunciation. The condition on which it depends is not a condition subsequent, but is strictly a condition precedent. Jarman on Wills, 806, note 1, *p.* It is clear that the right to dower is unaffected by the devise, and continues until the renunciation takes place; she cannot be both dowress and devisee at the death of her husband. Her possession would, by law, in the absence of any act amounting to election, be attributed to her right of dower, and her seisin in common with the heir, ascribed to the same right until the act of election, or the lapse is the limitation of election. One cannot hold under a will and against the will. If a widow is dowress, she cannot be a devisee of an estate in lieu of dower. Jarman on Wills, 806, note 1. The heir, therefore, in such case having the seisin cast upon him, and there being no assignment of the dower to vitiate a lawful seisin, and the law does not give to the act of election the effect to vitiate this lawful seisin, the heir had such seisin as will uphold curtesy in the husband. It was in the heir a determinable fee—determinable by election, and if the widow had died before election, the heir of the first seised would have succeeded, as he would in case of any other determinable estate of inheritance. Preston on Estates, 432, 433, 444. It is settled by adjudication that both estates tail and determinable fee, are subject to curtesy. 4 Kent, 32 (marg, p. 38).

The difference between the effect of a will, by which the testator disposes of his whole estate in his will by creating a life estate with remainder over, and the case where he does not dispose of his whole estate, but merely proposes a substitute for the dower to be accepted or rejected after his death, may be thus stated: In the former case, those claiming the remainder, claim under the will as purchasers, and can only take in that character, and after a life estate carved out of a whole fee disposed of, and to claim by descent, is to claim against the will. To claim as remainder merely supposes an estate divided and separated. In the latter case, the fee is not divided. The heirs take nothing by the will,

and do not take a reversion by descent, because there was no reversion in the testator at his death.   See 4 Kent, 390.   The whole fee was in him, and the reversionary interest could only be created by an act to be done after his death.   Between the occurrence of the event from which the life estate was to spring up, and the death of the testator, by operation of law, the fee descended to the heir as a whole.   This temporary seisin was enough to support the tenancy by the curtesy.   There was, therefore, an interest in the land in Ayres, the husband, not bound by the decree, and the purchaser is not compelled to accept the title thus encumbered.   The report is so much a part of the sale, that there is no sale, without it is made and sanctioned.   If the decree does not fix the time, they are in the nature of other limitations.   The decree contemplated a sale on credit, and as there can be no title until the report and confirmation thereof, clearly, that report must be made and confirmed before the credit expires. In this case the credit expired in 1861, and in 1862.   In Hael v. Coursery, 26 Miss., 520, the court announced that the day appointed for the report was the day for the appearance of all parties to except to the same.   The absence of the report renders it impossible to confirm it, or to act upon exceptions or to hear exceptions.   See Gowan v. Jones, 10 S. & M., 164; 2 Daniel's Ch. Pr., 1273.

The purchase bonds are not obligatory.   The terms of the sale of 1861 cannot be fulfilled, and the court must change or reform the contract, and endow it five years after the original sale, with new terms and stipulations.   The complainants, deprived of their remedy and the fruits of the decree, had the right to treat the sale as ineffectual.   They could not be compelled to accept insolvent security for solvent.   If the bonds only became binding in 1866, and sureties solvent at the sale, had become insolvent, could the complainants, at the end of five years, be compelled to take a worthless bond, any more than a purchaser to take a worthless title?   And can sureties be compelled to become sureties for insolvent principals?

In 1861, their principals were solvent, and they could, with some confidence, estimate what their condition would be at the end of a year or eighteen months, but not what it would be at the end of five years.  In 1861, they had certain rights; the statutory judgment being a lien on all the property of the principals, including the estate purchased.  On payment of the debt, they would have been substituted to the rights of the creditors.  They would have had a speedy and summary remedy while their principals were solvent.

In Jackson v. Edwards, 7 Paige, 486, the chancellor declared that where, by the fault of the vendors (complainants in procuring a title), which occasioned a delay, during which the property depreciated in value, the purchaser ought not to be compelled to complete his purchase.

It is to be observed that the American courts have, of late years, shown a decided tendency to regard time in the matter of sales of land, as of the essence of the contract, because of the extreme fluctuations in value—fluctuations unknown in England and other older countries.  No vendor could, after a delay of five years, during which the lands had sunk in value, insist on a specific performance.  Brashier v. Gratz, 6 Wheaton, 533; 3 Parsons on Contracts, 386; Dart on Vendors and Purchasers, 209.

As respects the slaves, it is now impossible to complete the purchase.  The court can give no title, and none was conferred by the sale unconfirmed.  It is as much out of the power of the court, now, as it would have been, had emancipation occurred before the time fixed for the report of the decree.  The parties occupy the exact position, in this respect, as individuals under a contract of sale before the consummation of the sale.  The loss falls on the owner.  The delivery of possession, by the commissioner, was unauthorized and ineffectual to carry the property in the slaves.

The confirmation of a sale is, in a great measure, a matter of discretion.  The discretionary power of courts of equity here, except wherein the statute may effect it, is just what it was in England, and unless changed by statute, on principle, it is the same now.

*Walter & Scruggs*, on same side.

Shall the report of sale, under all the circumstances, be confirmed? There are two principles of law that must govern the decision of this court: 1st. A sale made by a commissioner in chancery under its decree, does not divest title to the property sold, unless reported to and confirmed by the court. Learned v. Matthews, 40 Miss., 210; *Ex parte* Buck, ib., 239. 2d. The confirmation or rejection of the commissioner's report rests in the sound discretion of the court. Jackson v. Edwards, 1 Tenn.; 386; Spring v. Sandford, ib., 550; Haywood v. Covington's heirs, 4 Leigh., 373; 2 Daniel's Ch. Pr., 1462, 1463, 1464, 1465.

These cases are, in almost every instance, assimulated to cases for specific performance, and in all those cases, it has been held that specific performance will not be denied, when great time has elapsed, when the value of property has been affected, or when from any circumstances it would be iniquitous to enforce the contract. Seton v. Slade, 3 Leading Cases in Equity, 49; Pearson v. Moreland, 7 S & M., 609; Planters Bank v. Neely, 7 How., 80; Liddell v. Sims, 9 S. & M., 509; 2 Story Eq., §§ 771-4-8; 1 Sug. on Vendors, 297, 298 and 313; 1 Hilliard, 432; Smith's heirs v. Christmas, 7 Yerger, 565-581; Blackwilder v. Lovelace, 21 Ala. Rep., 471; King v. Hamilton, 4 Peters, 311; Seymour v. Delancey, 6 Johns. Ch. Rep., 222; Rochester R. R. Co., 18 Barbour, 350. With these cardinal principles before it, this court will have no difficulty in reaching a conclusion. Even the principals at this sale, Hull and also Ayres, were he living, could ask this court to confirm. Five years had intervened between the date of sale and the making of the report. A revolution unparalleled in the annals of time, had marked those years.

How does the case stand as to Clayton as surety for Hull? The latter was solvent when the purchase was made. To force a payment now, would sweep away all his lands, leave him bankrupt, and Clayton as surety to pay the debt. How is it with Davis? His principal, Ayres, was abundantly

solvent when the slave was bought, and the purchase money became due. That principal is now dead, and his estate insolvent, and Davis must pay this bond, if this report of sale is confirmed. The law favors sureties in some instances above and beyond principals. Johnson v. Planters Bank, 4 S. & M., 165. Davis v. Wickle, Freeman's Ch. Rep., 548; Smith v. McLeod, 3 Ired. Ch. R., 390 ; Ashby v. Smith, 9 Leigh, 164; Nelson v. Williams, 2 Dev. & Bat. Ch. Rep., 118 ; Alexander v. Bank of Commonwealth, 7 J. J. Marsh., 580 ; Mc-Callum v. Hinckley, 9 Verm., 143 ; Chichester v. Mason, Leigh, 244.

It was the duty of Cocke to make his report to the March term 1861, of the circuit court. He knew that duty, but did not do it. He was equally bound to return the bonds for the purchase money into court; but he carried them to Texas and held them there for years. Had he returned them, they would have become judgments and liens upon the property of the principal. The sureties could have paid them, and have sued out execution and forced an immediate repayment of the money. The discretion of the court must be a sound one, and according to law. Legal discretion is the application of well established rules of law, to new cases presented for the action of the court.

But we are told that the purchasers could have compelled Cocke to make his return to the March term of the court. This is not true in point of fact, as shown by the record. Cocke had all of the first day of the court to make his return, and the record shows that the court set only one day. Purchasers had no power to act. Cocke had. He could have reported the sale and filed the bonds any day between the 7th of February and 27th of March, and it was his duty to do so. The law was not complied with on account of the fault of complainant ; and the force of a judgment, which would otherwise have attached to the bonds, is lost to the sureties. All liens, all right to execution are gone. Davis goes further. He alleges and proves that Cocke, in violation of both law and public policy, bought the slave Joe, at his

own sale; that the slave was unsound to the knowledge of Cocke; that Cocke sold him afterwards to Ayres, and took from him Davis' endorsment of the facts, an obligation stating that the slave was sold at the commissioner's sale and bought by Ayres. Fraud or improper conduct will prevent a confirmation of sale. Planters Bank v. Neely, 7 How., 80; Pearson v. Moreland, 7 S. & M., 609. But we are told that Davis is estopped by his bond. Estoppels are abhorred in law. But who ever heard of an estoppel being pleaded by a party who had procured it by his own fraud? The rule is well settled that the defendant, in answer to a bill for specific performance, may prove that the written instrument sought to be enforced, does not correctly express the argument of the parties, but that through fraud, surprise or mistake, there is some material omission, insertion or variation, contrary to the intent or understanding of the parties. Story Eq., §§ 769–770, and note; Jaynes v. Stathan, 3 Atk., 388; Clark v. Grant, 14 Vesey, 519–524; Winch v. Winchester, 1 Ves. & B., 375; Clinan v. Cooke, 1 Sch. Lef., 22–38, 39; Letcher v. Cosley, 2 A. K. Marshall, 106; Wood v. Lee, 5 Monroe, 57; Ratcliff v. Alison, 3 Rand., 537; Brooks v. Wheelock, 11 Pick., 437; Towner v. Grattan, 13 Grattan, 705–714; Oathcourt v. Roberson, 5 Peters, 262. The cases cited by appellant's counsel from 9th and 10th Grattan are not in point.

SIMRALL, J.:

The appellants, in 1860, brought their bill in the chancery court of Marshall county, seeking the sale of a tract of land and slaves, in order that the proceeds might be divided among them. The property came to them as heirs and distributees of Thomas Redus, deceased. The property had been devised by Redus to his wife, for life, or during her widowhood. No other testamentary disposition had been made of it. Redus died in 1844, and his widow in 1859.

The court decreed a sale of the land on credits of nine and eighteen months, and the slaves on a credit of nine months,

and appointed Charles Cocke a commissioner to execute the decree. The sale was made on the 7th of February, 1861, and bonds for the purchase money executed. The commissioner removed to Texas in 1862, and remained there until 1866. Report of sale was not made until 1866. Hull purchased the land at $18 per acre, and gave bonds with A. M. Clayton as surety. F. G. Ayres bought one of the slaves, and gave bond, with Davis as surety. In January, 1867, appellants filed a bill or petition, suggesting the rendition of the decree, the sale under it, the loss of papers from the file of the suit, and asking that they might have the benefits of the decree by a confirmation of the report of sale, and an enforcement of payment of the bonds, given by the purchasers. To this proceeding the purchasers and their sureties were made parties defendants.

On final hearing the chancellor refused to confirm the report as to the lands, but directed Hull to restore possession of the land, and directed an account to be taken charging Hull with the rents of the land for the time he cultivated it, crediting him with valuable improvements. The report was confirmed as to the sale of the slaves, except as to one sold to F. G. Ayres.

From this decree an appeal is prosecuted. Hull, the purchaser of the land, and Clayton, his surety, resist the confirmation of the sale on several grounds. 1st. That the title is incomplete—there being outstanding in Joseph Ayres, who was the husband of Delia, daughter of Thomas Redus, deceased, an estate as tenant by the curtesy. 2d. On account of the lapse of time from the date of sale, before a report was made, and an application to confirm. 3d. The changed condition of the country, induced by the ravages of war, greatly reducing the pecuniary circumstances of Hull and his surety—the depreciation in the value of the lands, etc.

First. Is the title imperfect, for the reason alleged?

Tenant by the curtesy, is where a man marries a woman seised of an estate of inheritance, that is, of lands and tenements in fee simple or fee tail, and has by her issue, born

alive, capable of inheriting her estate. Black. Com., 99, 100.

It is objected to this title, that Delia, daughter of Thomas Redus, deceased, and one of his heirs, and wife of Joseph Ayres, was seised of an undivided interest in the land, and that upon her death, her husband (still living), is entitled to an estate by curtesy. The seisin must be during the coverture, and by the English common law, *in fact.* The case is put, of a man seised in fee simple, who dies leaving a daughter, and she marry and die before any entry made by herself and husband. The husband shall not be tenant by the curtesy. And the technical reason of this was, that the wife must have actual possession of the inheritance. And of things lying in livery, the wife hath not actual entry until the death of her husband. 3 Bacon Abr., 11, title, Curtesy.

If the land be in lease for years, there may be curtesy without entry or receipt for rent. The possession of the lessee being deemed the possession of the husband and wife.

The necessity of entry, originated in the rule, invariable at common law, " that an entry must be made in order to vest a freehold." Co. Lit., 51; and for the further reason, perhaps, that it was incumbent on the husband to preserve, unembarrassed, the descent to the issue of the marriage. When the descent was cast, the entry of the mother, as heir, was necessary, or otherwise her issue must claim title direct from the grand-father or other person last seised.

The doctrine in England and those states, which have strictly followed the mother country is, that where entry or actual possession may be made or taken, it is absolutely necessary in order to give curtesy. 6 B. Monroe, 175; Neely v. Buller, 10 B. Monroe, 48; Petty v. Mallier, 15 B. Monroe, 591. As if a woman be disseised, and then marry, husband must regain the seisin during coverture, to entitle him to curtesy. 1 Roper on Husband and Wife, 8; 1 N. J., 525.

In these cases, a seisin in law, which carries with it a right of possession, is not enough to give the husband the estate by curtesy. In this state, and perhaps, now in nearly all the states, livery of seisin, with its attendant ceremonies

of " breaking a twig," or turning a " sod," is unknown. Free-hold estates are transferred by patent, by deed, or by descent cast, without other or further ceremony. In tracing title by inheritance, as successive descents are cast, proof of entry is never deemed necessary to a recovery, or as in anywise affecting the course of descents. A fee simple owner is seised of all his lands, which are not in the actual *pedis pos-sessio* of an adversary. A deed of conveyance of a freehold estate, of itself, operates to create a seisin of the land in the donee or grantee, unless in adverse possession of another. Davis v. Mason, 1 Peters, 506 ; Jackson v. Tellick, 8 Johns., 268.

It would follow, from this, the estate by curtesy attaches, wherever there was a seisin of the wife, during coverture, with actual possession of husband and wife, or with a right of immediate entry, and such entry could be made by the voluntary act of the husband. The principle resting on the proposition that the owner of the fee, whether by descent cast, by deed patent or devise, is " seised," whether he has a *pedis possessio* or not ; provided, there is not an adverse occu-pant and claimant, and that a formal entry, during the cover-ture is not necessary. Green v. Leter, 8 Cranch, 249 ; Clay v. White, 1 Munford, 162 ; Smott v. Lecatt, 1 Stewart, 590 ; 23 Missouri Rep., 115.

The cases in our reports accord with the authorities cited, which hold that there must be a seisin in fact, or in law ; and if the latter, there must be a right of immediate entry, unob-structed by an adverse holding. Day v. Cochran, 24 Miss. R., 276 ; Robb v. Griffin, 26 Miss. R., 582.

The case of Malone v. McLaurin and others, 40 Miss. R., 162, was, whether the surviving husband was entitled to the curtesy *estate* in lands devised by the father to the daughter, to take effect after the termination of a life estate in favor of testator's widow. The wife died before the termination of the particular estate. It was held that the husband took no estate, for the reason that the wife " never acquired any right to the actual possession and enjoyment of the estate." The

rule, as gathered by Chancellor Kent, from the authorities, is recognized fully, " that if there be an outstanding estate for life, the husband cannot be tenant by the curtesy of the wife's estate, in remainder or reversion, unless the particular estate be ended during the coverture." 4 Kent Com., 29.

If the particular estates fall in during coverture, there is a right of immediate entry, and of the pernancy of the profits and rents, which completes the title to this sort of estate, although there may not have been actual entry. A very brief recital of the facts, will show that within the purview of the principles we have stated—Joseph Ayres has no estate by curtesy, in any of the land. Thomas Redus died in 1844. His widow, the devisee for life, died in 1859. Delia, the daughter of Thomas Redus deceased, married Joseph Ayres in 1850, and died in 1856. The widow had been in the enjoyment of her life estate for fifteen years, when the marriage occurred, and survived her daughter Delia, wife of Ayres, three years or thereabouts.

2d. We proceed now to consider the other objections made to the sale, and the relief asked by the complainants. There are material differences in the mode of conducting such sales here and in England. In the English practice the business is conducted by a permanent master of the court; and in all of its stages, is under the direction and control of the chancellor or his officer. As a matter of course, the biddings are opened on a sufficient advanced offer. The purchaser is required to make a deposit, which may be forfeited if he does not complete the purchase. More emphatically may it be said, that the court is the vendor than under our system. 2 Dan. Ch. Pr., 1270, *et sequitur*. With us the sale is more like those made by the sheriff under executions. The most important difference being, that the commissioner must report his proceedings, and obtain the action of the court on them. If the commissioner is delinquent, any party in interest, including the purchaser, may apply to the court for confirmation. The purchaser from the moment that the property is struck off to him, is deemed a party in interest, and

submits himself to the jurisdiction of the court. According to the English practice, it is quite common for him (at his own expense and costs) to move the court for confirmation of sale, or for any other relief necessary to a full investiture of his rights as purchaser. 2 Dan. Ch. Pr. above quoted. The authorities agree that there must be a confirmation of sale made under a chancery or probate decree. Until confirmation the transaction is said to be *in fieri*, subject to the discretion and control of the court; not an arbitrary discretion, but established in principles defined. Confirmation is a matter of course, and a matter of right also, either at the instance of the complainants or the purchaser, unless good cause be shown against it; such as accident, surprise, mistake, or fraud, in some of the parties connected with the sale, or interested etc., in it. Inadequacy of price alone, disconnected with other circumstances, will not suffice to refuse confirmation. Mitchell v. Harris. *

If the sale has been conducted openly and fairly, according to the terms of the decree, the complainants have a right to its fruits, and the purchaser a clear right also to the thing bought, and a title thereto. When the purchaser has done all that he is required to do, and the commissioner is in default, he may invoke the chancellor to adjudge the sale complete, and thereby have his title assured. Whilst the general proposition is true that the sale ought regularly to be reported to and confirmed by the court, in order to its completeness, it is quite as well established that such confirmation is not an absolute requisite, or condition precedent to the title in the purchaser. A confirmation *in pais*, may be as effectual to work this result, as the judicial act of the court. If the parties in interest to the sale, have so acted in reference to it, as to regard it as an accomplished fact; a rule, that confirmation by the court should nevertheless be essential, would be purely technical, founded in no broad views of policy or reason. The order of confirmation amounts to a judicial ascertainment, and declaration that the com-

* *Supra,* p. 314.

missioner has conducted the sale agreeable to the decree, and that the purchaser, on his part has complied also.

Now, if the property has been sold at public vendue, bond and surety given by the purchaser, and a deed executed, and he has gone into possession, there has been a substantial execution of the decree and a performance by vendor and vendee of the essential acts of the sale, and *pro tanto* recognition of it. If the purchaser has continued in possession for several years, sowing and reaping, enjoying the profits and products of the property, this, it seems to us, would be as complete a ratification *in pais* as could be made by him. In these circumstances, could the complainants be heard to claim that there should be a re-sale because there had been no confirmation by the court, on the suggestion that the lands had appreciated in value? On the other hand, could the purchaser be relieved on the showing that the property had depreciated? The question is not whether the price now be high or low, whether there has been an increase or diminution in value? but rather was the sale fairly made in the mode prescribed by the decree. The fact that the purchaser bid off the property at the price it was sold to him, is very cogent evidence of its market value at the time, and perhaps conclusive of his estimate of its worth. He took the risk of its future fluctuations in value, and was as competent to guess and speculate as to the causes and influences that would spring up in coming years to affect values, as the complainants or the commissioner. An examination of adjudged cases will sustain these views. A formal decree of confirmation, on motion made for that purpose, is not absolutely necessary. Any action of the court in recognition of the validity of the sale is as good as a formal confirmation, as in the case of Conger v. Robinson, 4 S. & M., 221. The dismissal of a *supersedeas* of the execution on the purchaser's bond was equivalent to a confirmation. Tooley v. Gridley et al., 3 S. & M., 515, was a confirmation by the parties. The sufficient thing done was the issuance of execution on the bonds. "If," observed the court, "the money had been col-

lected and paid over, no one would contend that any further confirmation was necessary to pass the title, yet the complainant has given his assent as fully by accepting the bond and issuing execution.   Confirmation by the acts of the parties is as valid as if decreed by the court.   The case decided in 5 Paige, 48, the purchaser was allowed the benefit of his bid and to go on and complete the purchase, although the commissioner had reported another person as the successful bidder.

We are of opinion that the parties have confirmed this sale by their acts, and that as a consequence thereof, the title of Hull is complete to the land, and that the complainants are entitled to the purchase money.   The sale was made in 1860; a deed, duly executed and acknowledged by the commissioner, was put on record.   Hull at once went into possession.   That year he sowed wheat on the land.   In 1862 he offered to pay his bonds in Confederate money and state bank notes.   During the war the land was in the line of great army movements.   Its fencing was destroyed, and it was unfit for cultivation.   After the war the fencing was rebuilt, and the cultivation resumed, which has been continuously kept up.   Since the war, because of his changed fortune (not alleging any objection to the title, or any inconvenience to himself on account of anything done or omitted to be done by the commissioner), Hull proposed to surrender the land and pay $1,000 to be relieved of his purchase.

These acts and facts on his part make the most full recognition of the sale, and of himself as the unquestioned owner of the property, and come under the operation of the principle of confirmation *in pais*.   Nor in this connection can we overlook the fact that shortly after this sale the country became involved in a most destructive and protracted civil war, which seriously interfered with, and interrupted the ordinary flow and transaction of business in and out of the courts.   Marshall county, the venue of this litigation, was for a long time the theater of active military operations.   The legislation of the state, too, during this period, discour-

aged the enforced collection of claims by judicial means.

The bonds of the purchaser were taken to Texas by the commissioner, in 1862—perhaps as a place of greater safety. But of this we are not informed. But it is highly probable, if they had been lodged in the chancery clerk's office of Marshall county, they would have been lost, as were many of the papers in the cause. The acquiescence of the complainants in the sale for so long a time, and in the occupancy and use of the property by Hull, ought to be conclusive on them. Their delay to press for the money may well be referred to the disorders and distempers of the times, added to the fluctuations of a depreciated currency. The refusal to accept the proffered payment in 1862 is put by the commissioner on this latter ground.

Most of the principles we have been discussing in reference to the sale of the land, are also applicable to the sale of the slaves. The chancellor confirmed the sale of all the slaves, except as to Joe, bought by F. G. Ayres. Ayres' bond recites the purchase under the decree, and it is insisted that this is an estoppel. The parol proof shows that Joe was knocked off at the sale, to Cook, or one Cummings, and that F. G. Ayres was not present. This being so, it is evident that Ayres was substituted as the purchaser, and made himself, by executing bond, stand in the shoes of the successful bidder, and assume all his responsibilities. By voluntarily assuming that position, and taking possession of the slave, he should be estopped when called upon for payment, from setting up an objection of that sort. It would be to allow a premium for bad faith.

The subsequent emancipation by paramount national and state authority, does not furnish a sufficient excuse for non-payment of the price. The decisions on this point are numerous in this court. Wherefore we reverse so much of the decree as refuses to confirm the sale of the land to Hull, and of the slave, Joe, to Ayres, and remand the cause to the chancery court of Marshall county, with directions to make such confirmation. On further proceedings in said court,

complainants, appellants here, will be entitled to a decree ordering a sale of the land purchased by Hull, and if said sale will not realize enough to pay the bonds, less the interest which has been realized, then a personal decree for the balance against Hull and his surety. Also a like personal decree against the purchasers of the slaves, and their sureties.